UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

ROLANDO GRULLON,

                      Plaintiff,

          -v-

THE ADMINISTRATION FOR CHILDREN'S
SERVICES, et al.,

                  Defendants.

------------------------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED:__3/16/2021__

18-cv-3129 (LJL)

<u>OPINION AND ORDER</u>

LEWIS J. LIMAN, United States District Judge:

      Plaintiff, Rolando Gruillon ("Plaintiff" or "Gruillon") appearing *pro se*, brings this action

under 42 U.S.C. § 1983 and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132,

seeking damages for the commencement of child neglect proceedings against him.  Dkt No. 22.

He sues the New York City Administration for Children's Services ("ACS"), the City of New

York, and eight ACS employees: Gladys Carrion, David Hansell, Contessa Pou, Miriam

Vasquez, Frank Lawani, Tahisha Fontaine-Longworth, Angela Allen, and Shanel Monroe.  *Id.*

      Defendants move to dismiss Plaintiff's Second Amended Complaint ("SAC") for a

failure to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6).  Dkt No. 52, 53.

For reasons set forth below, the motion is granted.

## BACKGROUND

      The following facts are taken from the SAC, documents referenced therein, and

documents of which the court may take judicial notice, including relevant Family Court orders

and the Article 10 petition.  *See Lomnicki v. Cardinal McCloskey Servs.*, 2007 WL 2176059, at

*1 n.1 (S.D.N.Y. July 26, 2007) (taking judicial notice of Family Court orders).  The allegations

are construed liberally in favor of the *pro se* plaintiff and are assumed to be true for the purposes

of this motion only.

Gruillon is a New York resident who allegedly suffers from depression and bipolar disorder.  He was also the father of a young daughter.  He alleges that as a result of actions by the ACS, which resulted in issuance by a New York Family Court of a Temporary Order of Protection, he was deprived of his ability to parent his daughter for over a year, and "lost valuable and some of the most precious moments of her life as a result of this situation all because [he] was not allowed in her life."  Dkt No. 22 at 8.  He points out: "I can never get that back."  *Id.*  At the end of the over one-year period, a New York Family Court dismissed the ACS petition against Grullon.  He now has custody of his daughter with supervision.

Gruillon's travails began on or about April 14, 2015.  On that date, ACS filed a petition (the "Neglect Petition") against him in the Family Court, Bronx County, pursuant to Article 10 of the Family Court Act.  N.Y. Fam. Ct. Act § 1011 *et seq*. ("Article 10").  Dkt. No. 54 ("Koroleva Decl."), Ex. A at 2–6.  The petition alleged that Gruillon, who at the time had custody of his daughter, had neglected her.  It sought an order that the child be determined to be a neglected child under Article 10.  Under that provision, ACS (among others) may apply to the Family Court for a temporary order of removal upon a determination that a child is being neglected.

An addendum to the Neglect Petition listed three specific grounds upon which ACS suspected Grullon of neglect.  The first ground was that Gruillon "ha[d] a diagnosis of depression and bi[]polar disorder," for which he was prescribed medication, and that he had "admitted he is prescribed Zoloft and he has not been taking it for 'sometime' and instead he is taking an herbal supplement."  *Id.* at 6.  The second ground was that the child's mother had alleged that Plaintiff abused her during pregnancy, "kick[ing] her in the stomach and push[ing]

her against the wall," and that such abuse continued after the birth of the child.  Specifically, the mother accused Gruillon of continuing to threaten her and of "yelling and screaming for [sic] her for no reason," and stated that she feared for her safety and the safety of the child.  *Id.*  The third ground was based on Domestic Incident Reports in which the police reported observing swelling and redness on the mother's face while she was pregnant with the child and the mother's reports that the redness and swelling resulted from Gruillon "continually banging her head against the wall."  *Id.*

That same day, April 14, 2015, the presiding Family Court Judge, Robert D. Hettleman, found good cause and issued a Temporary Order of Protection, effective until April 17, 2015, ordering Plaintiff to "stay away from" his daughter and her mother, "except for liberal agency supervised visitation."  *Id.*, Ex. B at 2.  Among other things, the order prevented Gruillon from visiting his daughter at the mother's home and from communicating with his daughter.  *Id.*

The court extended the order on six occasions through June 1, 2016, each time upon "good cause having been shown," and each time with respect to Gruillon based on the same petition filed by ACS on April 14, 2015.  *See id*., Ex. C at 2–13.

On July 15, 2015, ACS amended the petition, adding the child's mother as a respondent. *See id.*, Ex. D at 6–7.  The petition against the mother was supported by Gruillon's accusation, reported by ACS, that the mother had visited Gruillon and climbed onto a fire escape to try to access his home, leaving the child unattended in a hallway.  *Id.*  According to ACS, the mother admitted to that conduct.  *Id.*

The Order of Protection against Gruillon was in effect for over one year, from April 14, 2015 until May 6, 2016.

Ultimately, on May 6, 2016, "after examination and inquiry into the facts and

circumstances, and after hearing the proofs and testimony offered in relation thereto," the court issued an Order of Dismissal, dismissing ACS's petition with prejudice and finding that its "[a]llegations [were] not established." *Id.*, Ex. E at 2.

On June 1, 2016, after "consider[ing] the best interests and safety of the child, including whether the child would be at risk of abuse or neglect if returned to the parent," the court issued an Order of Disposition, releasing the child "to the custody of [Plaintiff] with supervision of a child protective agency, social services official, or duly authorized agency." *Id.*, Ex. F at 3.  The court included the following conditions on the release of the child to Gruillon's custody: that he (1) "attend mental health services"; (2) "permit ACS to visit and clear [the child's] home for overnight parenting time"; (3) "[s]ign all appropriate HIPAA waivers or consents so that ACS can monitor [the child's] progress in services"; (4) "[c]ooperate with ACS supervision, including announced and unannounced home visits"; and (5) "[m]aintain contact with ACS, and accept all reasonable referrals". *Id.*

## PROCEDURAL HISTORY

On April 9, 2018, Plaintiff commenced this suit under § 1983 and the ADA, seeking damages for the commencement of child neglect proceedings against him.  Dkt. No. 2 ("Initial Complaint") at 1–2.  In the Initial Complaint Grullon identified himself and his daughter as disabled, and alleged that ACS's allegations in the Neglect Petition were "improper in that acts which occurred before a child is born cannot be the basis of a child protective proceeding." *Id.* at 1.  Plaintiff further asserted that "[c]ounsel for ACS should have known that the Petition was not legally sufficient to state a cause of action" and that "[t]he Petition was ultimately dismissed by [the Family Court Judge] Robert Hettleman." *Id.* at 1–2.  Plaintiff further alleged that as a result of the Family Court proceedings, he and his daughter "were wrongly separated during a formative period in her life, . . . were subjected to [] harmful treatment by ACS, suffered and

4

continue to suffer the stigma attached to being a Respondent and a Subject Child in an ACS case,

[and his] name is listed on the State Central Registry for Child Neglect."  *Id.* at 2.  Contending

that "the above has exacerbated [his] [p]ost [t]raumatic [s]tress [d]isorder and other mental

illnesses" and that the "separation caused serious permanent mental and physical damage to

[himself] and [his] daughter," Plaintiff sought ten million dollars in compensation.  *Id.*

On August 3, 2018, Chief Judge McMahon, acting *sua sponte*, issued an order granting

Plaintiff leave to amend his complaint.  Dkt No. 6.  The Court concluded that the Initial

Complaint "does not plead sufficient facts to show how his rights were violated and who

specifically violated his rights" in compliance with Federal Rule of Civil Procedure 8, but, "in

light of Plaintiff's *pro se* status, the Court grant[ed] him leave to provide a short and plain

statement showing that he is entitled to the relief."  *Id.* at 4.  Chief Judge McMahon directed

Plaintiff to plead additional facts with respect to his due process, stigma plus, malicious

prosecution, and disability discrimination claims against municipal and individual defendants.

*Id*. at 5–14.

On September 13, 2018, Plaintiff filed an amended complaint against the City, Shanel

Monroe, Tahisha Fontaine-Longworth, and Frank Lawani.  Dkt. No. 7 ("First Amended

Complaint") at 3.  Plaintiff again alleged that the child neglect proceeding was improper because

the allegations that formed the petition's basis were later "admitted in court [to be] untrue" and

"occurred when no child existed."  *Id*. at 8.

On October 3, 2018, Judge Koeltl, to whom the case was then assigned, denied Plaintiff's

request to appoint counsel to represent him.  Dkt No. 9.  On January 11, 2019, a pre-motion

conference concerning an anticipated motion to dismiss was held before Judge Koeltl.  *See* Dkt.

Nos. 16–17.  The court permitted Plaintiff to file a further amended complaint.  *Id*.

On April 1, 2019, Plaintiff filed the SAC against the City, ACS, and eight individuals. Dkt. No. 22.  The SAC states that child neglect "is a deficit in meeting a child's basic needs, including the failure to provide adequate health care, supervision, clothing, nutrition, housing as well as their physical, emotional, social, educational and safety needs" and that "[Plaintiff] did none of these accusations."  *Id*. at 8.  Specifically, Plaintiff alleges that "no special investigations [were] conducted to prove that [he] was not capable of raising [his] daughter," that "no[] papers were served to [him] by the courts," and that he "never got evaluated by a professional psychiatrist."  *Id.* at 8.  Plaintiff asserts that his "[due] process was violated because the child was never born at the time and [ACS] had only taken the mother[']s word with[]out them finding out all facts legally."  *Id.*  With respect to individual defendants, Plaintiff claims that he "was discriminated because [he suffers from] depression" and that "this harmed [him] by not being able to have [his] child prior to the child even being born [sic.]."  *Id.*  Plaintiff further alleges that Defendants Gladys Carrion and David Hansell, commissioners of ACS, failed to supervise other ACS employees, and that five ACS directors and caseworkers "basically gave the ok for malicious prosecution."  *Id.*  Against one caseworker, Shanel Monroe, Plaintiff alleges that she "violated [his] right by claiming that [he] was unable to take care of [his] daughter because [he] was not taking [his] medication at the time."  *Id.*  Plaintiff adds that "[Monroe's] investigation was coerced [and] not based on facts, but merely false accusations because she was using [his] medication as [the] base of her investigation that [he] wasn't able to take care of [his] child," and that she "fabricated [evidence] by using the [mother's] information as a defining factor resulting in [him] losing [his] daughter."  *Id.*  In sum, Plaintiff claims that he "lost valuable and some of the most precious moments of [his daughter's] life as a result of [the proceeding]" and that "[he] can never get that back".  *Id.*  Plaintiff seeks one million dollars in remedy.  *Id*. at 7.

On April 7, 2020, defendants filed a motion to dismiss the SAC.  Dkt. No. 53.  Plaintiff has not opposed the motion.

## STANDARD OF REVIEW

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court "accept[s] all factual allegations as true, and draw[s] all reasonable inferences in the plaintiff's favor."  *Austin v. Town of Farmington*, 826 F.3d 622, 625 (2d Cir. 2016).  This requirement "is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id*.  A complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007).  The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id*. at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (same).

While the law mandates dismissal for a failure to state a claim on which relief may be granted, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006) (internal quotation marks and citations omitted) (emphasis in original).

**DISCUSSION**

The stakes in this, as in every child removal proceeding, are serious.  On the one hand, the liberty protected by the Due Process Clause of the Constitution has long been understood to include "not merely freedom from bodily restraint, but also the right of the individual to . . . establish a home and bring up children."  *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).  That interest, of ancient lineage and integral to the concept of ordered liberty, is of the highest constitutional value.  *See id.* (deeming the rights to conceive and to raise one's children to be "essential").  At the same time, the state plainly has authority under its police powers to protect all of its residents, including the youngest, and in the exercise of that authority to obtain temporary orders of protection and removal when warranted.  *See DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189 (1989); *see also Prince v. Massachusetts*, 321 U.S. 158, at 167 (1944) ("[T]he state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare . . . .").  The Court first measures Plaintiff's allegations against the standards established under the Due Process Clause of the Fourteenth Amendment.  It then analyzes any other federal constitutional claims raised by Plaintiff's allegations and his claim under the ADA.

**A.     Due Process**

A due process claim in connection with a child neglect proceeding can arise as a matter of either procedural or substantive due process.  Neither claim is adequately stated here.

**1.     Procedural Due Process**

Parents indisputably have a "constitutionally protected liberty interest in the care, custody and management of their children."  *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999).  The state cannot deprive them of that constitutionally protected right absent due process.  Indeed, as a general rule, "before parents may be deprived of the care, custody, or management of their

8

children without their consent, due process—ordinarily a court proceeding resulting in an order permitting removal—must be accorded to them." *Southerland v. City of New York*, 680 F.3d 127, 149 (2d Cir. 2012) (quoting *Nicholson v. Scoppetta*, 334 F.3d 154, 171 (2d Cir. 2003)); *see also Shapiro v. Kronfeld*, 2004 WL 2698889, at *12 (S.D.N.Y. Nov. 24, 2004) (noting that "any interference with family integrity must be in accord with procedural and substantive due process guarantees") (citing cases). "[P]rocedural due process generally requires a hearing prior to depriving a parent of custody." *Cornigans v. Mark Country Day Sch.*, 2006 WL 3950335, at *5 (E.D.N.Y. July 12, 2006).

There are two types of procedural due process violations: a violation based on established state procedures and a violation based on random, unauthorized acts by state employees. *See Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F. 3d 877, 880 (2d Cir. 1996). Where a complained-of "deprivation is pursuant to an established state procedure, the state can predict when it will occur and is in the position to provide a pre-deprivation hearing." *Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) (citing *Hellenic Am. Neighborhood Action Comm.*, 101 F.3d at 880). Conduct is undertaken in accordance with established state procedures when, for example, it is "pursuant to a statute, code, regulation, or custom" or is the result of a decision made by a high-ranking official with "final authority over significant matters." *Viteritti v. Inc. Vill. of Bayville*, 918 F. Supp. 2d 126, 134 (E.D.N.Y. 2013) (citing *Chase Grp. All. LLC v. N.Y.C. Dep't of Fin.*, 620 F.3d 146, 152 n.3 (2d Cir. 2010)). As a general matter, due process requires a pre-deprivation hearing. *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011). By contrast, where a state employee deprives an individual of property or liberty through random, unauthorized acts, there is no procedural due process violation "so long as the State provides a meaningful post[-]deprivation remedy." *Hellenic Am. Neighborhood*

*Action Comm.*, 101 F.3d at 880.

Plaintiff alleges that his due process rights were violated because the temporary order of protection was entered based on conduct that predated the child's birth and because ACS simply "t[ook] the mothers word with[]out them finding out all facts legally."  Dkt No. 22 at 8.  This claim sounds in a deprivation of liberty based on established state procedures.  However, the SAC and facts of which the Court can take notice demonstrate that Plaintiff was deprived of his parenting rights only after he received a hearing before the family court.  Specifically, his child was removed from him pursuant to a temporary order of protection issued by the Family Court of the State of New York on April 14, 2015 upon "good cause having been shown," Koroleva Decl., Exs. B, G, and that Temporary Order of Protection was extended each time only after a hearing and only after the Family Court made a finding of good cause.  *Id.*, Ex. C.  Although Plaintiff was not present in court when the temporary order of protection was first issued on April 14, 2015, or on April 17, when the order was extended through April 21, 2015, the documentary evidence reflects that notice of ACS's petition was "duly given to [Plaintiff] pursuant to [§] 1036 or 1037 of the Family Court Act."  *Id.*, Ex. F at 2.  He thus was afforded notice and an opportunity to be heard, *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950), and if a party is afforded notice and an opportunity to be heard, "the traditional notions of fair play and substantial justice implicit in due process are satisfied."  *Milliken*, 311 U.S. at 463.  "That Plaintiff elected not to attend the hearing does not change the fact that the pre-deprivation hearing was available to him."  *Brennan v. Cnty. of Broome*, 2011 WL 2174503, at *9 (N.D.N.Y. June 2, 2011);[1] *see Johnson v. Queens Admin. for Children's Servs.*, 2006 WL

---

[1] Additionally, "there is no indication in the record that Plaintiff sought a rehearing of the Family Court matter because of his absence, or that he appealed the Family Court's determination to the Appellate Division [of] the New York State Supreme Court."  *Brennan*, 2011 WL 2174503, at

229905, at *5 (E.D.N.Y. Jan. 31, 2006) ("[E]ven though plaintiff did not attend the proceedings . . . wherein ACS filed a neglect petition for each of the children, he was still afforded due process by being given an 'opportunity to be heard at a meaningful time and in a meaningful manner.'") (citing *Rodriguez v. McLoughlin*, 214 F.3d 328, 225 (2d Cir. 2000)).  Moreover, Plaintiff was represented by counsel when he appeared before the court on April 21, 2015, August 5, 2015, September 28, 2015, and May 6, 2016.  Koroleva Decl., Ex. G.

Accordingly, Plaintiff has failed to state a claim for relief based on procedural due process.

## 2.   Substantive Due Process

The complaint also can be understood to raise a claim of substantive due process.  The interest of a parent in the custody of his or her child is "a fundamental, constitutionally protected liberty interest."  *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).  Although "brief removals [of a child from a parent's home] generally do not rise to the level of a substantive due process violation, at least where the purpose of the removal is to keep the child safe during investigation and court confirmation of the basis for removal," *Nicholson*, 334 F.3d at 172 (citing *Tenenbaum*, 193 F.3d at 600–01, n.12)); *cf. Joyner ex rel. Lowry v. Dumpson*, 712 F.2d 770, 778 (2d Cir. 1983) (upholding, against a substantive due process challenge, New York's mandatory custody transfer requirement, because it did "not result in [the] parents' wholesale relinquishment of their right to rear their children"), the deprivation of Gruillon's right to raise his child here was neither short-lived nor non-disruptive.  Plaintiff was without custody of his daughter for over twelve months at a critical time in her life, during which time he had only limited, monitored access to his child.

_____

*9.

At the same time, while weighty, the right to family integrity does not automatically and invariably "override the sometimes competing government interest in the protection of minor children, [] particularly in circumstances where the protection is considered necessary as against the parents themselves." *E.D. ex rel. V.D. v. Tuffarelli*, 692 F. Supp. 2d 347, 360 (S.D.N.Y. 2010) (quoting *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir.1999)) (internal quotation marks omitted).  To sustain a substantive due process claim against the state's perceived infringement of valid liberty or property interests, "a plaintiff must demonstrate that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).  "[T]he 'shock the conscience' standard is satisfied where the conduct was 'intended to injure in some way unjustifiable by any government interest,' or in some circumstances if it resulted from deliberate indifference."  *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1906 (2018) (quoting *Lewis*, 523 U.S. at 849–50).  The Second Circuit has held that "substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority."  *Natale v. Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999).

In the child removal context, "because the law contemplates a careful balancing of interests, a parent's substantive constitutional rights are not infringed if a caseworker, in effecting a removal of a child from the parent's home, has a reasonable basis for thinking that a child is abused or neglected."  *Southerland*, 680 F.3d at 152.  "Where a case[]worker's action concerning removal of infant from parent's custody is 'incorrect or ill-advised' or where an investigation is 'faulty,' such deficiencies do not rise to the level of an unconstitutional investigation, provided that the case[]worker's action is 'consistent with some significant portion

of the evidence before [her].'"  *Orlik v. Dutchess Cnty.*, 603 F. Supp. 2d 632, 647 (S.D.N.Y.

2009) (quoting *Bukovinsky v. Sullivan Cnty. Div. of Health & Fam. Servs.*, 2008 WL 191018, at

*8 (S.D.N.Y. Jan. 16, 2008)); *see e.g., V.S. v. Muhammad*, 595 F.3d 426, 431 (2d Cir. 2010)

(concluding that even if the caseworker had been aware that the presiding doctor had a

"reputation" for over-diagnosing child abuse, it was not unreasonable for them to rely on the

doctor's diagnosis when her opinion was shared by other doctors).  While "[t]he government

must conduct a sufficient investigation into the alleged neglect or abuse it relies upon to establish

a reasonable basis for its action," *Graham v. City of New York*, 869 F. Supp. 2d 337, 350

(E.D.N.Y. 2012) (citing *Nicholson v. Williams*, 203 F. Supp. 2d 153, 251 (E.D.N.Y. 2002)),

"mere failure to meet local or professional standards" or "a faulty investigation does not

necessarily rise to the level of an unconstitutional investigation."  *Wilkinson*, 182 F.3d at 106

(holding that notwithstanding deficiencies in investigation—subject child's express claims raised

significant doubt as to the likelihood of abuse; there was an absence of any medical evidence;

investigator interviewed the child only once, using leading questions; investigator sought

corroboration from a child psychiatrist who had met with the child only two or three times—

caseworkers had a reasonable basis to suspect abuse because the investigation "generated

significant information supporting a finding of abuse").  Accordingly, courts find constitutional

violations only in "obvious extremes," such as when caseworkers "[ignore] overwhelming

exculpatory information or [manufacture] false evidence."  *Wilkinson*, 182 F.3d at 104; *see e.g.,*

*Hirsch v. Otsego Cnty. Dep't of Soc. Servs.*, 1992 WL 59178, at *4–5 (N.D.N.Y. Mar. 12, 1992)

(finding that a reasonable jury could conclude that a caseworker's bias against plaintiff and

failure to pursue "credible and believable" leads were "so egregious that it shocked the

conscience"); *Estiverne v. Esernio-Jenssen*, 833 F. Supp. 2d 356, 373 (E.D.N.Y. 2011) (finding

due process violation where plaintiffs were without custody of their three infant children for nearly ten months following a court-ordered removal and defendant doctor "both ignored significant exculpatory evidence *and* manufactured a false or reckless diagnosis").

Plaintiff has not alleged a violation of substantive due process.  Plaintiff complains that ACS based its decision on his conduct before his child was born and by simply accepting the mother's word about his conduct.  He alleges that the ACS caseworker "[claimed] that [Plaintiff] was unable to take care of [his] daughter because [he] was not taking [his] medication at the time" and that "her investigation was . . . not based on facts, but merely false accusations because she was using [his] medication as base of her investigation that [he] wasn't able to take care of [his] child."  Dkt. No. 22 at 8.  Plaintiff further alleges that Monroe "fabricated [evidence] by using the [mother's] information as a defining factor resulting in [Plaintiff] losing [his] daughter."  *Id*.  He notes that "no special investigations" were conducted and he was not evaluated by a professional psychiatrist.  *Id.*  In his complaint, Plaintiff alleges that the mother's allegations are untrue.  *Id.*[2]

Courts in this Circuit have held, however, that ACS is not precluded from considering the parent's pre-birth conduct in determining whether post-birth there is reason to believe that the "physical, mental or emotional conditions [of the child] ha[ve] been impaired or is in imminent danger of becoming impaired as a result of [the parent failing to] exercise a minimum degree of

---

[2] To the extent Plaintiff alleges that ACS caseworkers "violated [his] right by claiming [he] was neglecting [his] child because [he] did not bring [his] daughter inside when there was [an] order of protection on [him] not to go near her," he is misguided.  Dkt. No. 22at 8.  The amended neglect petition shows that the two incidents in which the child's mother "climbed onto the fire escape in order to try and access [Plaintiff's] home, leaving the [] child unattended in the hallway" formed the basis of adding the mother as a respondent to the child neglect proceeding.  Koroleva Decl., Ex. D at 7.  The record does not suggest that ACS relied on these incidents in suspecting that Plaintiff neglected his child.

care . . . in providing the child with proper supervision or guardianship . . . or by any other acts of a similarly serious nature."  N.Y. Fam. Ct. Act § 1012(f)(i)(B); *see e.g.*, *Orlik*, 603 F. Supp. 2d at 646–47 (dismissing substantive due process claim where caseworkers filed a petition for temporary removal of child based on a hospital report indicating mother's prescription-drug seeking behavior while pregnant and a police report documenting that child's father had "kicked [mother] in the back and had kicked her in the stomach . . . when she was five months pregnant"); *Kia P. v. McIntyre*, 2 F. Supp. 2d 281, 289–91 (E.D.N.Y. 1998), *aff'd*, 235 F.3d 749 (2d Cir. 2000) (dismissing substantive due process claim where municipal agency placed a hold on a newborn's release from hospital because "the results of the initial toxicology screen, taken together with [mother]'s history of substance abuse, gave the [h]ospital and [agency] a reasonable basis to believe that [the child] was in danger of abuse or neglect, and clearly justified their limited actions"); Dkt. No. 6 at 6 (Chief Judge McMahon holding the same in this case).

In any event, ACS's petition was not based solely—or even primarily—on Plaintiff's conduct before the child's birth.  ACS also rested its showing of good cause on reports that, after the child's birth, Gruillon continued to threaten the mother and would "go from being calm to yelling and screaming for her for no reason," and that he had stopped taking his prescribed medication for depression and bipolar disorder.  Koroleva Decl., Ex. A at 6.  Moreover, contrary to Plaintiff's allegation that ACS simply relied on the mother's say-so, the petition itself reflects that before ACS made its determination it obtained information from the staff at Barrier Free Living Program of Plaintiff's diagnosis and obtained Domestic Incident Reports corroborating the mother's reports.

"The Constitution does not grant . . . an independent right [to an adequate child abuse investigation]."  *Kia P.*, 2 F. Supp. 2d at 293; *see Tenenbaum v. Williams*, 862 F. Supp. 962, 978

(E.D.N.Y. 1994), *aff'd in part, vacated in part*, 193 F.3d 581 (2d Cir. 1999).  Plaintiff has not

alleged that there was exculpatory evidence, much less overwhelming exculpatory evidence, that

ACS ignored.  *Wilkinson*, 182 F.3d at 104.  While he alleges that the mother made a false report,

he does not allege that ACS knew or even had reason to suspect, that the report was false or that

ACS manufactured evidence.  He does not dispute the authenticity of the Domestic Incident

Reports or that they and the Barrier Free Living Program said what they were reported to have

said.  While Plaintiff denies that he physically abused the mother, he does not dispute that the

mother alleged the physical abuse or claim that the information was fabricated by Monroe.

Although Gruillon alleges that he would have testified differently than the mother did and that

her claims were untrue, that is a purpose of the notice and hearing—so Gruillon could confront

the allegations against him.  Ultimately, the Family Court found that they were unsubstantiated.

ACS was not required to accept Gruillon's account and its failure to do so is not cause to second-

guess its judgment or find it violated due process.  *Orlik*, 603 F. Supp. 2d at 647.[3]  Plaintiff has

not alleged ACS's action was so "egregious" or "outrageous" as to "shock the contemporary

conscience," *Lewis*, 523 U.S. at 847 n.8.

### 3.    Stigma Plus

A stigma-plus claim, asserted in the Initial Complaint and the First Amended Complaint,

is omitted in the SAC.  Nonetheless, pursuant to the Court's obligation to interpret *pro se*

pleadings to raise the "strongest [claims] that they *suggest*," *Triestman*, 470 F.3d at 474–75, the

---

[3] "In light of the presumption of regularity attributed to state judicial proceedings, an intervening independent judicial determination that a reasonable basis exists for limiting the exercise of parental rights generally cleanses any subsequent infringement of unconstitutional taint." *Graham*, 869 F. Supp. at 352–53 (citing *Southerland*, 680 F.3d at 153–55).  "Only if a plaintiff can show that the government's request for removal or an order of protection was summarily approved by the Family Court on the basis of false or greatly flawed ACS representations, or that the judicial proceeding was otherwise substantially tainted, will a court-ordered separation be found to infringe on a parent's substantive due process rights."  *Id*. at 354.

Court addresses the claim.

"A 'stigma-plus' claim is a subset of procedural due process." *Grasson v. Bd. of Educ. of Town of Orange*, 24 F. Supp. 2d 136, 147 (D. Conn. 2014). "'Stigma-plus' refers to a claim brought for injury to one's reputation (the stigma) coupled with the deprivation of some 'tangible interest' or property right (the plus), without adequate process." *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003). "Although damage to one's reputation is not by itself sufficient to invoke the procedural protection of the Due Process Clause, [a plaintiff] can demonstrate infringement of a protected liberty interest by showing that inclusion of her name on the [state child abuse registry] resulted in 'stigma plus.'" *McCaul v. Ardsley Union Free Sch. Dist.*, 514 F. Appx. 1, 3–4 (2d Cir. 2013) (citing *Valmonte v. Bane*, 18 F.3d 992, 999, 1000–02 (2d Cir. 1994)). "To establish a 'stigma plus' claim, a plaintiff must show (1) 'the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false,' and (2) 'a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights.'" *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010) (quoting *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004)). It is not normally sufficient for the plaintiff to allege that he has suffered "the deleterious effects which flow directly from a sullied reputation." *Valmonte*, 18 F.3d at 1001. The standard however, can be satisfied by, for example, the deprivation of "an opportunity to seek employment caused by a statutory impediment established by the state." *Id.* In *Valmonte*, for example, the Second Circuit held that the plaintiff established a claim of "stigma plus" deprivation where the Statewide Central Register for Child Abuse and Maltreatment ("SCR") did not simply defame her but also "place[d] a tangible burden on her employment prospects." *Id.* Under New York law at the time, child care providers were required to consult with the SCR before hiring prospective

employees, and thus, "by operation of law, [the plaintiff's] potential employers [would] be informed specifically about her inclusion on the [SCR] and [would] therefore choose not to hire her." *Id.*

Here, the allegations in the SAC are insufficient to allege a plausible stigma-plus claim because Plaintiff does not allege that he was subject to a tangible burden beyond loss of reputation as a result of his inclusion in the SCR. Plaintiff "does not allege that [he] applied for employment or sought to foster or adopt a child" since his inclusion in the registry. *McCaul*, 514 Fed. Appx. at 4. "Nor does [he] allege that [he] would have looked for a job involving children and senior citizens, or would have sought to foster or adopt a child but for [his] being listed on the SCR." *Id.* (citing *Valmonte*, 18 F.3d at 999 (finding plaintiff's claim ripe because "[w]e must accept as true [plaintiff]'s assertions that she would look for a position in the child care field but for her presence on the [SCR]")); *see Finch v. N.Y.S. Office of Child. & Fam. Servs.*, 499 F. Supp. 2d 521, 529 (S.D.N.Y. 2007) (plaintiff applied for a position at a homeless shelter while the report alleging child abuse or maltreatment was "indicated"). Further, Plaintiff does not allege that "SCR ever disclosed to anyone the fact that [he] was listed on the SCR or that SCR failed to offer [him] an administrative hearing to challenge the purported finding of 'indicated.'" *McCaul*, 514 Fed. Appx. at 4; *see* N.Y. Soc. Serv. Law § 412(7) (a report alleging child abuse or maltreatment is "indicated" "if an investigation . . . determines that some credible evidence of the alleged abuse or maltreatment exists"); *Finch*, 591 F. Supp. 2d at 528 ("Within ninety days after the subject of a report of child abuse or maltreatment is notified that a report is indicated, the subject may request the SCR to amend and seal the report"; "[i]f the SCR does not amend an indicated report in accordance with a subject's request to do so within ninety days of receiving that request, the subject has the right to an administrative hearing to determine whether the report

should be amended from indicated to unfounded."). Lastly, Plaintiff "does not allege that the report against [him] is still 'indicated.'" *McCaul*, 514 Fed. Appx. at 4. On the contrary, the SAC alleges that the neglect petition against Plaintiff was "dismissed due to [a]llegations not established." Koroleva Decl., Ex. E at 2; *see* N.Y. Soc. Serv. Law § 422(5)(a) ("Notwithstanding any other provision of law, the office of children and family services may, in its discretion, grant a request to expunge an unfounded report where . . . the subject of the report presents clear and convincing evidence that affirmatively refutes the allegation of abuse or maltreatment . . . ."). Together, Gruillon has failed to state a plausible claim that he was subject to "stigma plus."

### B. Fourth Amendment

The complaint also could be read to allege an illegal seizure in violation of the Fourth Amendment. An individual is seized if, under the circumstances presented, "a reasonable person would have believed that he was not free to leave." *Gardiner v. Inc. Vill. of Endicott*, 50 F.2d 151, 155 (2d Cir. 1995) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)); *see Kia P.*, 2 F. Supp. 2d at 292 (finding that a hold placed on infant's release from hospital constitutes a Fourth Amendment "seizure" because infant's mother was not free to take the infant home). The Second Circuit has held that "the state's assumption of custody to protect a child constitutes a seizure under the Fourth Amendment." *Taylor v. Evans*, 72 F. Supp. 2d 298, 310 (S.D.N.Y. 1999) (citing *Tenenbaum*, 193 F.3d at 593).[4]

---

[4] It is unclear whether a child being removed to another parent's custody, as opposed to the state's custody, constitutes "seizure" within meaning of the Fourth Amendment. *See e.g., Shapiro*, 2004 WL 2698889, at *48 ("Plaintiff's only potentially viable Fourth Amendment claim concerns the alleged warrantless seizure of [children], assuming that [caseworker]'s instructions to [children's father] to keep the children constitutes a warrantless seizure."); *Graham*, 869 F. Supp. 2d at 355 (not reaching whether child would have a claim for his seizure by ACS when family court orders denied father plaintiff lawful and unimpeded contact for nearly four years, during which time the child remained under mother's custody); *Taylor*, 72 F. Supp.

Plaintiff's Fourth Amendment claim is defective both procedurally and substantively.  As a matter of process, Fourth Amendment rights are "personal rights that cannot be asserted vicariously."  *Graham*, 869 F. Supp. 2d at 355 (citing *Alderman v. United States*, 394 U.S. 165, 174 (1969); *Tenenbaum*, 193 F.3d at 601 n.13).  If plaintiff's child was unreasonably seized, it is the child who has suffered the Fourth Amendment injury.  The parent's Fourth Amendment interest is derivative and not personal; the parent only has a Fifth and Fourteenth Amendment liberty interest in the child.  And, as a matter of process, a parent does not possess independent standing to assert a Fourth Amendment claim based upon the seizure of his child any more than any other person can assert a Fourth Amendment claim based on a search or seizure of another. The parent can only assert a claim on his child's behalf.  *Kia P.*, 2 F. Supp. 2d at 292 (a parent "does not have standing to assert a derivative or vicarious Fourth Amendment claim based upon . . . search or seizure of [his or her child], but . . . does have standing to assert a Fourth Amendment claim on [the child's] behalf") (citing *Tenenbaum*, 862 F. Supp. at 973–74). However, Plaintiff is proceeding *pro se* and therefore can only represent himself, *see, e.g., Jones v. Niagara Frontier Transp. Auth.*, 722 F.2d 20 (2d Cir. 1983); *Davidoff Hutcher & Citron LLP v. DiPietro*, 2021 U.S. Dist. LEXIS 381 (S.D.N.Y. Jan. 4, 2021), and cannot represent his minor child.  *See* Dkt. No. 6 at 3; *Cheung v. Youth Orchestra Found.*, 906 F.2d 59, 61–62 (2d Cir. 1990) ("[a] non-attorney parent must be represented by counsel bringing an action on behalf of his or her child"); *Iannaccone v. Law*, 142 F.3d 553, 558 (2d Cir. 1998) ("[b]ecause pro se means to appear for one's self, a person may not appear on another person's behalf in the other's cause"); *Wenger v. Canastota Central Sch. Dist.*, 146 F.3d 123, 125 (2d Cir. 1998) (*per curiam*)

---

2d at 310 (implicitly assuming that removal of plaintiff's two children to their grandmother's home, while the Department of Social Services held their custody, "constitutes a seizure under the Fourth Amendment").  Notwithstanding this uncertainty, the claim fails on other grounds.

(minor children "are entitled to trained legal assistance so their rights may be fully protected") (quoting *Cheung*, 906 F.2d at 61).[5]

As a substantive matter, even if Plaintiff had standing to assert a claim on his child's behalf, the analysis under the Fourth Amendment would be similar to that under the Due Process Clause. Similar to the standard governing substantive due process analysis, the Fourth Amendment analysis "requires the Court to determine whether the defendants' actions were 'objectively reasonable' in light of the facts and circumstances confronting them." *Kia P.*, 2 F. Supp. 2d at 292 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). "In the context of a seizure of a child by the State during an abuse investigation . . . a court order is the equivalent of a warrant." *Tenenbaum*, 193 F.3d at 602. "Generally, the removal of a child from his parents' custody is reasonable, for purposes of the Fourth Amendment, if it is effectuated pursuant to a court order." *Estiverne*, 833 F. Supp. 2d at 379 (citing *Hernandez v. Foster*, 657 F.3d 463, 474 (7th Cir. 2011)).

Just as in the case of a *Franks* hearing with respect to a search warrant, *see Franks v. Delaware*, 438 U.S. 154 (1978), "when caseworkers, in their petition for removal, make intentionally or recklessly false statements that are necessary to a court's finding of probable cause, they are subject to Fourth Amendment liability." *Estiverne*, 833 F. Supp. 2d at 379 (citing *Southerland*, 652 F.3d at 227 (denying summary judgment for an allegedly illegal search based

---

[5] In New York State, when a parent brings a claim on behalf of his or her child, the claim may not be settled without the approval of a judge. N.Y. C.P.L.R. 1207 (Consol. 2021). The presiding judge has further authority to direct where the settlement amount is held or invested for the child. N.Y. C.P.L.R. 1210 (Consol. 2021). These substantive protections "grow[] out of the duty of the courts to protect those whom the law regards as incompetent to look after their own interests." *Greenburg v. New York C. & H. R. R. Co.*, 210 N.Y. 505, 509 (1914). "Infants are the wards of the courts, and [New York courts'] rules of practice abound in provisions of ancient origin designed to safeguard their legal rights." *Id.*

on a removal petition, where there were issues of material fact as to whether the caseworker "knowingly or recklessly made false statements in his affidavit" and as to whether "such false statements were necessary to the court's finding of probable cause"); *Greene v. Camreta*, 588 F.3d 1011, 1034 (9th Cir. 2009) (holding that a removal order effectuated "pursuant to judicial deception violates the Fourth Amendment")).

Here, however, as explained above, there is no well pled allegation of any false statement in the Neglect Petition, much less statements that ACS knew of false statements or acted recklessly with respect to the truth or falsity of the statements. Therefore, the SAC fails to state a claim for relief under the Fourth Amendment.

### C.    Malicious Prosecution

In the SAC, Plaintiff asserts that five individual defendants "basically gave the ok for malicious prosecution." Dkt. No. 22 at 8. Plaintiff further alleges that Monroe's investigations were "not based on facts, but merely false accusations" and that she "fabricated" evidence by relying on the mother's allegations of physical abuse. *Id*.

It is not settled in the Second Circuit whether the initiation of child neglect proceedings can give rise to a malicious prosecution claim. *See Washington*, 373 F.3d at 315–16 (2d Cir. 2004) ("While [the Second Circuit] has not foreclose[d] the possibility that 'civil prosecution [could] give rise to a cause of action under § 1983,' we [have] surmised that, absent official conduct that is conscience-shocking, 'it normally will not.'") (citation omitted); *Walker v. City of New York*, 621 Fed. Appx. 74, 76 (2d Cir. 2015) (acknowledging that it is unsettled law whether a child removal proceeding can form the basis for a malicious prosecution claim); *McCaul*, 514 Fed. Appx. at 4–5 (assuming without deciding that a neglect proceeding could give rise to a malicious prosecution claim); *Mortimer v. City of New York*, 2018 WL 1605982, at *22 (S.D.N.Y. Mar. 29, 2018) (noting that the Second Circuit law remains unsettled on whether

neglect proceedings can be the basis for a malicious prosecution); *Orlik*, 603 F. Supp. 2d at 649 ("The question of when a civil proceeding in Family Court can give rise to a malicious prosecution claim is not clearly established.")

Where a plaintiff is charged in an administrative proceeding, but "never taken into custody, imprisoned, physically detained or seized within the traditional meaning of the Fourth Amendment," there is no deprivation of liberty constituting a Fourth Amendment violation. *Washington*, 373 F.3d at 317.  Hence, "it is unlikely that a civil proceeding . . . would implicate constitutional rights in a manner that would warrant redress under § 1983." *Id*.; *see also Graham*, 869 F. Supp. 2d at 356 (quoting *Washington*).

Assuming a claim of malicious prosecution would even be available in this setting, to establish a malicious prosecution claim under New York law, a plaintiff is "required to show the following: '(1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice[,] and[ ] (4) the matter terminated in plaintiff's favor.'"  *Rentas v. Ruffin*, 816 F.3d 214, 220 (2d Cir. 2016) (alterations in original) (quoting *Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010)). "[W]hen a malicious prosecution claim is premised on a civil proceeding, a plaintiff must show a 'special injury'—'some concrete harm that is considerably more cumbersome than the physical, psychological or financial demands of defending a lawsuit.'"  *Gordon v. City of New York*, 2016 WL 3976657, at *6 (E.D.N.Y. July 22, 2016) (quoting *Engel v. CBS, Inc.*, 689 N.Y.S.2d 411, 417 (1999)).

Plaintiff fails to plead non-conclusory facts suggesting that defendants did not have probable cause to believe that their prosecution would succeed or that they acted with malice. Under New York law, probable cause in the context of a malicious prosecution claim is "the

knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief

that he has lawful grounds for prosecuting the defendant in the manner complained of." *Berry v.*

*Marchinkowski*, 137 F. Supp. 2d 495, 537 (S.D.N.Y. 2015) (quoting *Rounseville v. Zahl*, 13 F.3d

625, 629 (2d Cir. 1994)).  As discussed with respect to Plaintiff's substantive due process claim,

the SAC suggests that ACS had a reasonable basis in suspecting that Plaintiff's child was

neglected.  Koroleva Decl., Ex. A at 6.  Specifically, the petition provides three grounds upon

which ACS suspected Plaintiff of child neglect: (1) Plaintiff's statement that he had not been

taking his medication for depression and bipolar disorder for "sometime"; (2) allegations by the

child's mother that Plaintiff abused her during pregnancy and following the child's birth; (3)

Domestic Incident Reports documenting the mother's allegations of physical abuse.  *Id.*  "The

Court's conclusion is further supported by the Family Court's finding of 'good cause' to issue a

protective order against [Plaintiff]."  *Emanuel v. Griffin*, 2015 WL 1379007, at *9 (S.D.N.Y.

Mar. 25, 2015).  In a malicious prosecution case under New York law, "the issuance of a

temporary injunction or similar judicial recognition of the merit of the underlying case creates a

presumption of probable cause and places upon the plaintiff the burden of pleading facts

sufficient to overcome it."  *Butler v. Ratner*, 619 N.Y.S. 2d 871, 874 (3d Dep't 1994); *see*

*Hornstein v. Wolf*, 67 N.Y.2d 721, 723 (1986).[6]  Without making a plausible allegation that ACS

fabricated evidence or knew that the evidence upon which it was relying was fabricated or

concealed mitigating facts or that it acted with malice, Plaintiff fails to rebut this presumption

and, hence, to state a claim for relief.

---

[6] That the neglect petition was ultimately dismissed by Judge Hettleman does not require a
contrary conclusion because "[w]ere it otherwise, the second and third elements of a malicious
prosecution claim would be duplicative in most cases."  *Emanuel*, 2015 WL 1379007, at *9
(citing *Broughton v. State*, 37 N.Y.2d 451, 457 (1975)).

D.      **Disability Claim**

Plaintiff also alleges a violation of the ADA.  The complaint's allegations fail to state a claim for relief under that statute.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Under the Rehabilitation Act, "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).  The standards under the ADA and Section 504 of the Rehabilitation Act "are generally the same and the subtle distinctions between the statutes are not implicated in this case."  *Wright v. N.Y. State Dep't of Corrs.*, 831 F.3d 64, 72 (2d Cir. 2016) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)).  Therefore, the claims are considered in tandem.  *See Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999).  To prove a violation of Title II of the ADA, Plaintiff must establish: "(1) that he is a 'qualified individual' with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability."  *Hargrave v. Vermont*, 340 F.3d 27, 34–35 (2d Cir. 2003).

Under the first prong, Plaintiff must show that he is a "qualified individual" and that he has a "disability" within meaning of the ADA.  *Id.*  An individual is "qualified" when "with or without reasonable modification to rules, policies or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or

25

activities provided by a public entity."  42 U.S.C. § 12131(2).

Historically, many state courts have found that termination of parental rights do not constitute "services, programs or activities" within meaning of the ADA and thus that Title II of the ADA did not apply in child protection proceedings.  *See Watley v. Dep't of Child. & Fams.*, 2019 WL 7067043, at *2 (D. Conn. Dec. 23, 2019); *see also* Michael Lanci, Note, *In the Child's Best Interests? Rethinking Consideration of Physical Disability in Child Custody Disputes*, 118 Colum. L. Rev. 875, 883 n.51 (2018) (citing *In re Adoption of Gregory*, 447 N.E.2d 120, 124 (Mass. 2001); *In re Doe*, 60 P.3d 285, 290–91 (Haw. 2002)).  However, in 2015, the U.S. Department of Justice Civil Rights Division and the U.S. Department of Health and Human Services Office of Civil Rights issued a findings letter which stated that, "Title II [of the ADA] covers essentially everything state and local governments and their agencies do . . . including [the state child welfare system's] investigations, assessments, removals, family preservation, provision of services, determining goals and permanency plans, setting service plan tasks, reunification, guardianship, adoption, and assisting clients in meeting such tasks."  Letter from U.S. Dep't of Justice, Civil Rights Division & U.S. Dep't of Health & Human Serv., Office for Civil Rights, to Interim Comm'r Erin Deveney, Mass. Dep't of Children & Families (Jan. 29, 2015); *see Watley*, 2019 WL 7067043, at *24 (stating that in accordance with the letter, "state courts have . . . taken steps to ensure that child protection proceedings comport with the ADA"); *see also Pennsylvania Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 209–12 (1998) (discussing the breadth of Title II's coverage).  The Court assumes that Plaintiff is a qualified individual.

Next, the ADA defines "disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . ."  42 U.S.C. § 12102(1).

Disability determination under the ADA "is an individualized inquiry" that does not rest on the mere diagnosis of an impairment. *Sutton v. United Airlines*, 527 U.S. 471, 483 (1999); *see Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002) ("It is insufficient for individuals attempting to prove disability status . . . to merely submit evidence of a medical diagnosis of impairment."). For the statute's purposes, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). The ADA directs courts that "[t]he definition of disability in this Act shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." *Id.* § 12102(4)(a). To be "substantially impaired" from performing a major life activity, a plaintiff must have an impairment that "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Toyota*, 534 U.S. at 297. "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication . . . ." *Id.* § 12102(4)(E)(i).

The SAC alleges that Plaintiff "has a diagnosis of depression and bi[]polar disorder." Koroleva Decl., Ex. A at 6. Courts in the Second Circuit have found that depression may qualify as a disability for purposes of the ADA, "provided that the condition is not a 'temporary psychological impairment,'" *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 539 (S.D.N.Y. 2009) (quoting *Oblas v. Am. Home Assur. Co.*, 1999 WL 759026, at *2 (2d Cir. 1999)), and the condition substantially limits a major life activity, *see Mabry v. Neighborhood Defender Serv.*, 769 F. Supp. 2d 381, 400–01 (S.D.N.Y. 2011). Bipolar disorder can also qualify as a disability

within meaning of the ADA.  *Compare Mazzocchi v. Windsor Owners Corp.*, 2013 WL 5295089, AT *7–8 (S.D.N.Y. Sept. 17, 2013) (finding it plausible, at pleading stage, that plaintiff had ADA-covered disability when she alleged that she had bipolar disorder and that it impaired her ability "to sleep, concentrate, learn, work, and interact with others"), *and Robles v. Medisys Health Network, Inc.*, 2020 WL 3403191, *23–25 (concluding, at pleading stage, that plaintiff plausibly alleged that his bipolar disorder, when active, substantially limits multiple major life activities, including concentrating, breathing, as well as brain function), *with Bonilla v. Boces*, 2010 WL 3488712, at *5–6 (W.D.N.Y. Sept. 2, 2010) (concluding, on summary judgment, that plaintiff could not establish prima facie case that she was disabled because her depression and bipolar disorder were not disabilities when plaintiff presented only "limited evidence" that they substantially limited major life activities), *and Horwitz v. L & J.G. Stickley, Inc.*, 122 F. Supp. 2d 350, 354–56 (N.D.N.Y. 2000) (concluding, on summary judgment, that plaintiff presented insufficient evidence to enable a jury to conclude that her bipolar disorder substantially limited any major life activities).

The SAC can be read to allege that Plaintiff's depression and bipolar disorder limit his ability to care for his child.  Courts in the Second Circuit have not examined whether child-rearing is a "major life activity."[7]  For purposes of this motion, this Court assumes that Plaintiff has pled facts sufficient to establish that his condition constitutes a disability within meaning of the ADA.

---

[7] The Supreme Court has held that the "[a]bility to reproduce and to bear children constitutes a 'major life activity' within meaning of the ADA," *Bragdon v. Abbott*, 524 U.S. 624, 625 (1998), because "reproduction could not be regarded as any less important than working and learning," two "major life activities" listed in 42 U.S.C. § 12102(2)(A).  *Id*. at 639.  By contrast, the Supreme Court has held that medical conditions that cause one to "reduce how often [one] plays with children . . . [do] not amount to such severe restrictions in the activities that are of central importance to most people's daily lives . . . ."  *Toyota*, 534 U.S. at 202.

Assuming that Plaintiff has alleged sufficient facts to demonstrate that he is a "qualified individual" with a "disability," the Court examines the second element of an ADA claim: whether Plaintiff was "excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity." *Hargrave*, 340 F.3d at 34–35. The ADA defines "public entity" as "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) . . . any commuter authority." 42 U.S.C. § 12131(1); *see Pierce v. Fordham Univ., Inc.*, 2017 WL 2589678, at *2 (2d Cir. June 15, 2017) ("Title II [of the ADA] applies only to state and local governments, their instrumentalities and commuter authorities."). Based on the notion that the ACS investigations, assessments and removals constitute an activity of a public entity, Plaintiff has plausibly alleged that he was discriminated against by the public entity.

Lastly, however, to sustain an ADA claim, Plaintiff must establish that the public entity's "exclusion or discrimination was due to his disability." *Hargrave*, 340 F.3d at 34–35. It is not sufficient to allege that Plaintiff was the victim of discrimination unless that discrimination was due to his "disability." Moreover, "[c]onsideration of [plaintiff's] disability, standing alone, is not a violation of the ADA." *Schweitzer v. Crofton*, 935 F. Supp. 2d 527, 553 (E.D.N.Y. 2013), *aff'd*, 560 Fed. Appx. 6 (2d Cir. 2014) (citing *Ward v. Murphy*, 330 F. Supp. 2d 83, 98–99 (D. Conn. 2004)). "The issue is whether [defendants] discriminated against [the plaintiff] *because of* her disability." *Id*. (emphasis added). "To establish that discrimination occurred 'by reason of' their disabilities, plaintiffs must demonstrate that disability discrimination was a 'but-for cause of any adverse' action." *Watley*, 2019 WL 7067043, at *8 (citing *Natofsky v. City of New York*, 921 F.3d 337, 348–49 (2d Cir. 2019)).[8] It is not sufficient to state a claim that a plaintiff's

---

[8] While *Natofsky* involved an allegation of employment discrimination based on plaintiff's

disability was one of several motivating factors—but not a "but-for" cause—behind a defendant's action.  *Id.*

Here, the SAC fails to allege that ACS and its employees decided to file a neglect petition based upon beliefs about Plaintiff's disability and its effects on Plaintiff's ability to care for his child.  In *Bolmer v. Oliviera*, 594 F.3d 134, 136 (2d Cir. 2010), the Second Circuit held that plaintiff "adequately alleged discrimination that was the but-for cause of his [hospital] commitment" where an employee at defendant municipal agency incorrectly assumed that plaintiff's relationship was a delusion based on his mental illness; conducted a non-individualized and cursory mental examination of plaintiff, throughout which the employee "looked at [plaintiff] as if he were crazy"; and committed plaintiff to a hospital.  *Bolmer*, 594 F.3d at 149.  The court concluded that plaintiff's allegations supported a conclusion that but for defendants' assumption that plaintiff's relationship was a delusion, plaintiff would not have been committed.  *Id.*

By contrast, more recently, in *Schweitzer*, 935 F. Supp. 2d at 554–56, the court rejected a claim that defendants "made assessments and conclusions of [plaintiff's] fitness to care for [her child] based on stereotypical views of individuals with mental illness."  The court concluded that

---

hearing disability, the Second Circuit's reasoning for concluding that the "but-for" causation—as opposed to a "mixed-motive" test "under which disability [need only be] one motivating factor in [the employer's] adverse employment action but [need not be] its sole but-for cause," *Parker v. Columbia Pictures Industries*, 204 F.3d 326, 336 (2d Cir. 2000)—is the correct standard under the ADA arguably applies with equal force in the child removal context.  In *Natofsky*, the Second Circuit reasoned that "[t]he ADA does not include a set of provisions like Title VII's § 2000e-2(m) (permitting a plaintiff to prove employment discrimination by showing that a discrimination was a 'motivating factor' in the adverse decision) and § 2000e-5(g)(2)(B) (limiting the remedies available to plaintiffs who can show that discrimination was a 'motivating factor' but not a but-for cause of the adverse decision)."  *Natofsky*, 921 F.3d at 348.  Further, "when Congress added §2000e-2(m) to Title VII, it 'contemporaneously amended' the ADA but did not amend it to include a 'motivating factor' test."  *Id.* (quoting *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167, 174 (2009)).

the county department of social services and caseworker's decision to remove plaintiff's child from her was not impermissibly based on plaintiff's bipolar disorder when: the department did not get involved until a second referral was made by the hospital at which plaintiff gave birth to her child; the caseworker conducted a careful and thorough investigation regarding plaintiff's past medical and personal history and her allegedly problematic behavior at the hospital; and the caseworker obtained from individuals, who had years of experience working with plaintiff, information about her conduct, behavior, and history of noncompliance with psychiatric treatment. *Id.* at 553. The court ruled, "[d]efendants based their decision to remove [the child] on a wide-range of evidence pertaining to [plaintiff]'s conduct and behavior that raised concerns regarding [plaintiff]'s ability to care for [the child], not based on her disability." *Id*. at 556.

This case is similar to *Schweitzer*. Here, the factual allegations in the SAC and the documents incorporated by reference establish that ACS did not rely on Plaintiff's "diagnosis of depression and bi[]polar disorder" alone, but rather on the fact that Plaintiff had refused treatment for those conditions—he was prescribed medication and admitted that he had not been taking that medication for some time. Koroleva Decl., Ex. A at 6. Moreover, in addition to Plaintiff's refusal to take his medication, ACS also relied on the mother's reports that Plaintiff physically abused her during her pregnancy, the claim that such abuse continued after the birth of the child, the evidence that Plaintiff would "yell[] and scream[] [at the mother] for no reason" and the mother's fear for the safety of herself and the child, and Domestic Incident Reports corroborating such allegations. *Id*. When Plaintiff suffers an adverse action because of his "unacceptable behavior, the fact that that behavior was precipitated by mental illness does not present an issue under the ADA." *Johnson v. Maynard*, 2003 WL 548754, at *5 (S.D.N.Y. Feb. 25, 2003) (plaintiff suffering from paranoid schizophrenia and bipolar illness with a history of

favorable performance evaluations failed to prove that she was discharged "because of" her disability when she exhibited erratic and abusive behavior at work); *see also McElwee v. Cnty. of Orange*, 700 F.3d 635, 644 (2d Cir. 2012) ("[The] inappropriate behavior [at issue] is indisputably a legitimate non-discriminatory reason for dismissing [plaintiff] from the volunteer program, even if the behavior resulted from his disability.").  Therefore, the SAC does not allege sufficient facts to suggest that but for Plaintiff's disability, defendants would not have filed the neglect petition.  Consequently, Plaintiff fails to state a claim under the ADA and the Rehabilitation Act.

### E.    Municipal Liability

The failure of Plaintiff's claims as a substantive matter is dispositive of its claims against the entities, ACS and the City of New York.  The entities cannot be liable for the constitutional torts of their employees if the employees did not commit constitutional torts.  Nonetheless, for purposes of completeness, the Court addresses separately whether, even if Plaintiff had pled a constitutional tort, the complaint would state a claim against ACS and the City of New York.

### 1.    ACS

ACS is an agency of the City of New York and cannot be sued independently.  N.Y. City Charter, Ch. 17. § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."); *see Graham*, 869 F. Supp. 2d at 349 (dismissing claims against ACS because it "cannot be sued independently" from the City of New York).  The SAC names ACS as a defendant.  Dkt. No. 22 at 1.  Accordingly, for that additional reason, the claims against ACS must be dismissed.

### 2.    City of New York

Plaintiff also names the City of New York as a defendant.

When a plaintiff sues a municipality under § 1983, the plaintiff must allege facts showing "(1) the existence of an officially-adopted 'policy, custom, or practice' and (2) a direct and deliberate causal connection between that 'policy, custom, or practice' and the violation of plaintiff's federally-protected rights." *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403–04 (1997)); *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (internal citations omitted). It is not enough for the plaintiff to allege that one of the municipality's employees or agents engaged in some wrongdoing—"a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436. U.S. at 691.

Plaintiff's Initial Complaint alleged no more facts about the City than that ACS commenced a child neglect proceeding based on Plaintiff's conduct before his child's birth. *See* Dkt. No. 2 at 1–2. Chief Judge McMahon therefore advised that in an amended complaint naming the City of New York as a defendant, Plaintiff "must plead facts showing that the City's customs or policies caused the alleged violation of his rights." Dkt. No. 6 at 13. The SAC does not allege the existence of an officially-adopted "policy, custom, or practice" or a direct and deliberate causal connection between that "policy, custom, or practice" and the violation of plaintiff's federally-protected rights. The essence of Plaintiff's claims is that his right to parent his daughter was violated based on facts that are idiosyncratic to his case. Therefore, Plaintiff fails to state a claim against the City under § 1983.

## F.     Individual Defendants

The defendants alleged to be supervisors, Gladys Carrion and David Hansell, move to dismiss on the alternative grounds that the complaint fails to state a claim for supervisory liability. The complaint against them is also dismissed on those grounds.

To state a claim under § 1983, a plaintiff must allege facts showing the defendants' direct

and personal involvement in the alleged constitutional deprivation.  *See Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).  A plaintiff can establish a supervisory defendant's personal involvement through allegations that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id*.

The SAC fails to allege facts that show how the supervisory defendants were personally involved in the events underlying his claims.  Plaintiff makes the mere conclusory claim that Carrion and Hansell violated his rights through a "lack of supervision of the other ACS workers."  *Id*.  This single statement is inadequate to support a reasonable inference that the individual defendants, "after being informed of the violation through a report or appeal, failed to remedy the wrong," "created a policy or custom under which unconstitutional practices occurred," or were "grossly negligent in supervising subordinates who committed the wrongful acts."  *Id*.  Therefore, Plaintiff fails to show that Carrion and Hansell should be held liable for his claims under § 1983.[9]

---

[9] The ACS caseworkers also move to dismiss on the grounds that they are entitled to qualified immunity because "it was objectively reasonable for the caseworkers to believe their conduct did not violate clearly established statutory or constitutional rights of which a reasonable caseworker would have known."  *V.S.*, 595 F.3d at 430–31.  However, at the time of the conduct alleged here, it was clearly established that ACS could not rely on information it knew to be false in removing a child from her parent.  Plaintiff's claim is dismissed because it fails to state a claim for relief and not because the law he alleges to have been violated was other than clearly established.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss the SAC for a failure to state a claim is GRANTED.  The Second Circuit has made clear that district courts "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).  Although Plaintiff has already been given several opportunities to amend, the Court deems it prudent to give Plaintiff another chance.  Accordingly, Plaintiff shall have until May 14, 2021 to file a third amended complaint.  The Clerk of Court is respectfully directed to mail a copy of this Opinion and Order to Plaintiff, to terminate all pending motions, and to close the case, without prejudice to re-opening upon Plaintiff's filing of a third amended complaint before May 14, 2021.

SO ORDERED.

Dated: March 16, 2021
      New York, New York            _____
                                         LEWIS J. LIMAN
                             United States District Judge